**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

JOSEPH LEARY,
      Plaintiff,

      v.

ROY MANSTAN, FREDERIC FRESE,
WESTHOLME PUBLISHING, LLC,
      Defendants.

_____

FREDERIC FRESE, ROY MANSTAN,
      Counter Claimants,

      v.

JOSEPH LEARY,
      Counter Defendant.

No. 3:13-cv-00639 (JAM)


**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      This copyright case involves two non-fiction works about the so-called "Turtle," a

Revolutionary War-era submarine built by a farmer from Connecticut named David Bushnell.

The life of David Bushnell and his invention of the Turtle has captured the imagination of

several writers.[1] Plaintiff Joseph Leary is the author and copyright owner of an unpublished

manuscript on this subject, and so are defendants Frederic Frese and Roy Manstan, who wrote a

later book published by defendant Westholme Publishing, LLC.

      Plaintiff principally contends that defendants' book infringes on his copyright in the

unpublished manuscript. I conclude that there is no genuine issue of fact to support this claim. It

---

[1] The record reflects at least eleven books about David Bushnell and the Turtle, *see* Doc. #41-11 at 43, including an illustrated children's book, *see* June Swanson (ill. Mike Eagle), *David Bushnell and His Turtle: The Story of America's First Submarine* (1991).

is true that the two works are about much of the same basic subject matter, but there is no claim that defendants engaged in verbatim copying or close paraphrasing of plaintiff's work. Copyright law otherwise affords only narrow protection to works of history, and subsequent authors may utilize the same facts, theories, and concepts contained in prior works so long as they do not copy another author's particular original manner of expression. In view of this rigorous standard and my comparison of the two works at issue in this case, I conclude that no reasonable jury could find that defendants' book infringes plaintiff's copyright in the manuscript. Accordingly, I will grant defendants' motion for summary judgment.

## BACKGROUND

The Turtle—or the American Turtle, as it is sometimes called—is a fascinating historical curiosity. Well over a century before the advent of modern submarine warfare, David Bushnell built this one-man wooden submersible to conduct underwater attacks on the British naval fleet along American shores. Founding fathers like George Washington and Benjamin Franklin were aware of and supported Bushnell's efforts. Ultimately, the Turtle never accomplished its goal of destroying British ships. But in many ways the project was a success: the Turtle was the first submersible vessel used in a war, its revolutionary screw propeller design is still in use today, and Bushnell discovered how to make gunpowder explode underwater.

The history of David Bushnell and the Turtle submarine has long intrigued plaintiff Joseph Leary. In the 1970s, plaintiff worked with defendant Frederic Frese to build a working replica of the submarine. The replica was launched with much fanfare in 1977, and today it is on display at the Connecticut River Museum in Essex. While working on the 1977 replica, plaintiff researched information about Bushnell and the various techniques that Bushnell used to build the Turtle. Plaintiff's research has continued in the ensuing decades, and over the years plaintiff has

incorporated his discoveries into an ever-evolving (and as–yet–unpublished) manuscript weaving together a biography of Bushnell, historical information about the Turtle, and plaintiff's experiences building the replica.

At some point in the intervening decades, plaintiff gave Frese a copy of a version of his manuscript, which was then titled *The Famous Water Machine from Connecticut*.[2] That version began with the following dedication: "This work is inspired by and dedicated to Frederic Frese . . . without whom I would know absolutely nothing about David Bushnell or submarines." Doc. #53-6 at 3. In 2002, plaintiff applied for and was granted federal copyright registration with respect to a subsequent version of the manuscript, which had by then been retitled *David Bushnell and the American Turtle*. Plaintiff continues to work on the manuscript, and he intends to publish it once it is completed.

The 1977 replica of the Turtle would not turn out to be the only replica of Bushnell's submarine.[3] Over two decades later, in the early 2000s, the National Maritime Historical Society became interested in building another replica of the Turtle. The Society asked plaintiff to participate in the project, and plaintiff, in turn, asked Frese to join. Defendant Roy Manstan, an engineer from the Naval Undersea Warfare Center, was also brought in to assist with the building of another Turtle replica. The replica was to be built as part of a student education project at a high school in Old Saybrook, Connecticut.

Plaintiff's involvement with the second Turtle replica project was short-lived. Through a

---

[2] The manuscript that was allegedly given to Frese is dated 1996, *see* Doc. #53-6 at 4, but other evidence indicates that plaintiff actually gave the manuscript to Frese several years later, *see* Doc. #41-11 at 29–30.

[3] Others have also built "Turtle" replicas. *See* Randy Kennedy, *An Artist and His Sub Surrender in Brooklyn*, N.Y. Times, Aug. 4, 2007, available at http://www.nytimes.com/2007/08/04/arts/design/04voya.html?_r=0 (last accessed June 29, 2015), and Judy Campbell, *Turtle Lives Again as Replica Surfaces at Academy*, America's Navy (Apr. 14, 2003), http://www.navy.mil/submit/display.asp?story_id=6852.

series of events that are not entirely clear, plaintiff was allegedly "effectively . . . remove[d] . . . from the project." Doc. #41-11 at 98.

The project successfully went forward, however, and Manstan and Frese worked with high school students and others to build another Turtle replica. Frese and Manstan then wrote a book about the Turtle submarine, Bushnell, and their own experiences building a Turtle replica. Their book—titled *Turtle: David Bushnell's Revolutionary Vessel*—was published by defendant Westholme Publishing, LLC, in 2010. Sometime after it was published, plaintiff found defendants' book online and he purchased a copy of it. After reading the book, plaintiff "felt betrayed" because he believed that he "recognized [his] writing" in defendants' book. Doc. #41-11 at 109.

Thereafter, plaintiff initiated this lawsuit. In his complaint, plaintiff contends that defendants' book infringes on his copyright in the unpublished manuscript and he also claims that defendants' conduct violates the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.* Defendants have moved for summary judgment.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment

stage must be viewed in the light most favorable to the non-moving party and with all

ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S.

Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a

'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

To prevail on a copyright infringement claim, "two elements must be proven: (1)

ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original." *Feist Publications, Inc. v. Rural Tel. Serv. Co. Inc.*, 499 U.S. 340, 361 (1991). There is

no dispute in this case that plaintiff owns a valid copyright in his unpublished manuscript. To

satisfy the second element, plaintiff "must also show copying by defendants. . . . Copying may

be inferred where a plaintiff [1] establishes that the defendant had access to the copyrighted work

and [2] that substantial similarities exist as to protectible material in the two works." *Walker v.

Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986). For purposes of this motion only,

defendants have conceded they had access to plaintiff's manuscript.[4] *See* Doc. #41-1 at 5. This

leaves just one question: whether a triable issue of fact remains that the two works are

substantially similar.

The substantial similarity inquiry often involves questions of fact. Nevertheless, a district

court may "resolve [the substantial similarity] question as a matter of law [when] . . . the

similarity between two works concerns only non-copyrightable elements of the plaintiff's work,

or because no reasonable jury, properly instructed, could find that the two works are substantially

---

[4] It appears to be undisputed that defendants had access to at least one version of plaintiff's manuscript, but there is no indication as to how they might have obtained access to the copyrighted 2002 version. I need not concern myself with this factual ambiguity in view of defendants' concession regarding access to the manuscript.

similar." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010)

(internal quotation marks omitted). Put differently, summary judgment is proper when the lack of

substantial similarity is "so clear as to fall outside the range of disputed fact questions requiring

resolution at trial." *Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993) (internal

quotation marks omitted). The Court makes this assessment by engaging in a "detailed

examination of the works themselves." *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996)

(internal quotation marks omitted). "[T]he works themselves supersede and control contrary

descriptions of them . . . including any contrary allegations, conclusions or descriptions of the

works contained in the pleadings." *Gaito Architecture*, 602 F.3d at 64 (citation and internal

quotation marks omitted).[5]

In a copyright infringement action, "[t]he standard test for substantial similarity . . . is

whether an ordinary observer, unless he set out to detect the disparities [between the two works],

would be disposed to overlook them, and regard [the] aesthetic appeal as the same." *Id.* at 66

(some alterations in original) (internal quotation marks omitted). This test is often referred to as

the "ordinary observer test" because it "ask[s] whether an average lay observer would recognize

the alleged copy as having been appropriated from the copyrighted work." *Ibid.* (internal

quotation marks omitted).

But a court must apply this test carefully, ever mindful that not all elements of a

copyrighted work are protectable. Indeed, "[o]ften . . . a work's aesthetic appeal will be due

largely to unprotected elements. In these cases, we must be more discerning, [and] ignor[e] those

aspects of a work that are unprotectable as we apply the test . . . ." *Zalewski v. Cicero Builder*

---

[5] Moreover, expert testimony is generally "irrelevant" to the inquiry. *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992). For this reason, I have considered but do not place particular weight on the expert reports submitted by the parties. Instead, I rely on my detailed review of the two works to determine the existence of substantial similarity.

*Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (some alterations in original) (internal quotation marks omitted).

Which aspects of a work of history (like plaintiff's manuscript) are protectable and which are unprotectable? Historical facts and events are not protected. *See Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 306–07 (2d Cir. 1966). Neither are interpretations of historical events, such as theories, plots, or explanatory hypotheses. *See Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 974, 978–79 (2d Cir. 1980). The only thing that copyright law protects is the non-fiction author's original expression—that is, the author's particular manner of selecting, coordinating, excerpting, modifying, and arranging various public domain components. *See, e.g.*, *id.* at 974 (recognizing that "the scope of copyright protection in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain"); *Feist Publications*, 499 U.S. at 348–49 ("Factual compilations . . . may possess the requisite originality" for copyright protection because the author "typically chooses which facts to include, in what order to place them, and how to arrange the collected data," but this protection is "thin" because "a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement.").[6]

The Second Circuit has recently underscored this distinction between non-protection for facts and protection for peculiar expression:

> A fundamental rule of copyright law is that it protects only "original works of authorship," those aspects of the work that originate with the author himself. 17 U.S.C. § 102(a). Everything else in the work, the history it describes, the facts it mentions, and the ideas it embraces, are in the public domain free for others to

---

[6] The rule denying copyright protection to historical facts and interpretations is not without its critics. *See Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 293–96 (S.D.N.Y. 2012) (discussing judicial and scholarly criticism). Of course, I remain bound by Second Circuit and Supreme Court precedent on this subject.

> draw upon. It is the peculiar *expressions* of that history, those facts, and those
> ideas that belong exclusively to their author. *See* 17 U.S.C. § 102(b). Thus, any
> author may draw from the history of English-speaking peoples, but no one may
> copy from *A History of the English–Speaking Peoples.* Any artist may portray the
> Spanish Civil War, but no one may paint another *Guernica*. And anyone may
> draw a cartoon mouse, but there can be only one Mickey.

*Zalewski*, 754 F.3d at 102 (footnotes omitted).[7] Thus, anyone may write a book about the Turtle

submarine, David Bushnell, and his or her experiences building a replica of the Turtle, but no

one may "bodily appropriate" plaintiff's particular expressive treatment of these subjects. *See*

*Hoehling*, 618 F.2d at 980 ("In works devoted to historical subjects, it is our view that a second

author may make significant use of prior work, so long as he does not bodily appropriate the

expression of another.").

     In light of this legal framework, it is evident to me that no reasonable fact finder could

conclude that defendants' book is substantially similar to plaintiff's unpublished manuscript.

To begin with, it is undisputed that defendants' book contains no verbatim copying of plaintiff's

manuscript. Nor does the book contain any close paraphrasing. This is significant, because

"absent wholesale usurpation of another's expression, claims of copyright infringement where

works of history are at issue are rarely successful." *Id.* at 974. A review of the reported cases

from this Circuit demonstrates this point. As best I can tell, there is only one reported case within

---

[7] Plaintiff contended at oral argument that a lower threshold for substantial similarity applies in cases involving unpublished works. I am not convinced. The two cases that plaintiff relies on to advance this argument—*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), and *Wainwright Sec., Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977)—are inapposite. Both cases are legally distinguishable because they are about the fair use doctrine. It is true that the "unpublished nature of the work . . . figure[s] prominently in fair use analysis." *Harper & Row Publishers*, 471 U.S. at 553. But fair use is an "affirmative defense" to a claim of copyright infringement, *see id.* at 561, and defendants have not raised a fair use defense in their motion for summary judgment. And I do not reach the issue, either, because I find that there is no substantial similarity in the first place. Moreover, the cases are readily factually distinguishable from the present case. Both cases involved substantial verbatim copying of the plaintiff's work. *Id.* at 548 (noting that the defendant "lift[ed] verbatim quotes of the author's original language . . . constituting some 13% of the . . . article); *Wainwright Securities*, 558 F.2d at 96 (noting that the defendant "appropriated almost verbatim the most creative and original aspects of the [plaintiff's] reports"). In this case, by contrast, there is no verbatim copying or even close paraphrasing.

the Second Circuit in recent years where a party prevailed on a copyright claim involving the alleged infringement of a non-fiction book, and in that case the infringing book "copied between 25-30 percent of [the earlier book] verbatim or through close paraphrase." *Robinson v. Random House, Inc.*, 877 F. Supp. 830, 836 (S.D.N.Y. 1995). The absence of any verbatim copying or close paraphrasing weighs against a finding of substantial similarity.

I recognize, of course, that substantial similarity may exist even in the absence of obvious copying, and that protection is available for the "association, presentation, and combination of the ideas and thought which go to make up the [author's] literary composition." *Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987) (alteration in original) (internal quotation marks omitted). And there is no doubt that the works at issue in this case share some significant subject-matter similarities. Both plaintiff and defendants have built replicas of David Bushnell's Turtle submarine, and they have both chosen to write books that incorporate information about their experiences building the respective replicas, historical information about the Turtle, and biographical information about David Bushnell. The parties share similar experiences and interests, and it is these similar experiences and interests that gave rise to two works about the same thing. But I cannot say—and no reasonable fact finder could say—that these two works of non-fiction are substantially similar for copyright infringement purposes.

Most fundamentally, the two works adopt different approaches to similar subject matter. Plaintiff's manuscript is principally a work of history. The great majority of the manuscript is devoted to the history of the Turtle itself—the idea for an underwater submersible, the construction of the device, its missions in the New York harbor, and so forth. The manuscript also includes detailed biographical information about Bushnell himself, including anecdotes about Bushnell's early life, his experiences with the Turtle, his other activities during the

Revolutionary War, and his life following the war. Additionally, the manuscript contains information about post-Turtle developments in underwater warfare. True, the manuscript includes passages about plaintiff's personal experiences with Frese building, launching, and testing the first Turtle replica. But this information is set forth mostly in just two of the book's eleven chapters (Chapters 4 and 7), and it comprises less than 20% of the book. The overriding focus of plaintiff's manuscript is on the history of David Bushnell, the Turtle, and early submarines.

By contrast, defendants' book is principally focused on the technical aspects of designing and building the Turtle—both David Bushnell's original submersible and defendants' replica. Indeed, well over half of defendants' book is devoted to extended scientific discussions of various design and construction challenges facing builders of the Turtle—the propulsion system (Chapter 7), the shape of the hull (Chapter 8), creating a hatch (Chapter 9), devising an underwater explosion mechanism (Chapter 11), etcetera—and to detailed information about operational tests of defendants' Turtle replica (Chapters 12–18).

It is true that defendants' book incorporates a good deal of historical information throughout, and the book does contain biographical information about Bushnell himself. But this information mainly serves as context and orientation for discussions about the myriad technical challenges that Bushnell and defendants encountered when building the Turtle. And this technical focus is not surprising given that the book was written by a mechanical engineer (Manstan) and a technical arts teacher (Frese). In short, the respective works have obviously differing focuses and approach the material from different angles.

Plaintiff also contends that defendants have copied the structure of his manuscript, and he makes much of the fact that both works employ "flash-backs" and "flash-forwards" as they

transition back and forth between the Revolutionary War era, when the original Turtle was built, and modern times, when the respective replicas were built. Of course, a "flash-back" or "flash-forward" is nothing more than a standard storytelling device, and plaintiff enjoys no copyright protection in the usage of these devices. He does enjoy copyright protection in the particular manner with which he deploys these devices to structure his manuscript. But no reasonable juror could conclude that defendants have bodily appropriated the structure of plaintiff's manuscript in view of the different ways that the two works are structured.

Plaintiff's book is mostly a chronological historical account: a thorough description of the history of the Turtle, a biography of the entirety of David Bushnell's life, and a mini-treatise on the history of underwater vessels both pre- and post-Turtle. The book weaves in various discussions about the building of the replica throughout, but just two chapters can be fairly characterized as "flash-forwards" to the 1970s: Chapter Four, which discusses how the replica was built, who helped with the construction of the replica, and the publicity surrounding the replica; and Chapter Seven, which describes the various dives that the Turtle replica made. Plaintiff's manuscript is structured as a narrative, and it is apparent that the aim is to tell a compelling story. Information concerning the Turtle replica is largely background information, and is of interest only to the extent that it informs what we know about Bushnell and how he built the original Turtle.

Defendants' book utilizes a markedly different structure. The book is divided into four parts. Like the early pages of plaintiff's manuscript, Part One of defendants' book focuses in part on background information about pre-Turtle submersibles and Bushnell's early life. This section also introduces the Turtle and its various components. While this portion is somewhat similar to the beginning of plaintiff's manuscript, the rest of defendants' book is structured differently. Part

Two of the book turns to a detailed discussion about each aspect of the Turtle: how Bushnell might have solved each technical challenge, and how the authors (and their students) solved each technical challenge when building the replica. Part Three then exhaustively documents the various technical challenges that defendants encountered when testing their replica. The last and shortest section, Part Four, returns to the historical record as it details the circumstances leading to the Turtle's three attacks on British ships as well as the attacks themselves—material that plaintiff covers in the middle of his manuscript.

Unlike plaintiff's manuscript, defendants' book is largely not structured as a narrative at all. Rather, the majority of the book is structured like a technical manual: a series of extended descriptions of how to construct each part of the Turtle. The structure of the two books is not substantially similar.

Plaintiff also claims that defendants copied an original idea from his manuscript. Both works theorize that Isaac Doolittle, a New Haven clockmaker who built America's first printing press, may have assisted Bushnell in making the hatch for the Turtle submarine. *See* Doc. #41-4 (Pl.'s Manuscript) at 47; Doc. #41-7 (Defs.' Book) at 34, 36. According to plaintiff, he came up with this "original analysis" himself, and defendants copied it. Doc. #53 at 21. Even assuming that the theory about Doolittle making the hatch originated with plaintiff, this argument is meritless because theories about historical events are not protectable under the Copyright Act as a matter of law. *See Hoehling*, 618 F.2d at 978. In *Hoehling*, the Second Circuit held that an author's hypothesis that a particular individual destroyed the Hindenburg was "an historical interpretation" that was "not protected by [the author's] copyright and can be freely used by subsequent authors." *Id.* at 979. Just like a theory concerning who destroyed the Hindenburg, plaintiff's hypothesis about who made the Turtle's hatch is a historical interpretation that is not

protectable by copyright.

Plaintiff further complains that defendants' book contains a passage about David Bushnell's early life and upbringing that closely tracks a passage in his manuscript. *Compare* Doc. #41-4 (Pl.'s Manuscript) at 14–15, *with* Doc. #41-6 (Defs.' Book) at 49–50. The passages do indeed share similarities, which is unsurprising given that they both are brief descriptions of what little is known of Bushnell's early life. But plaintiff does not enjoy any copyright protection in particular facts about Bushnell's life or the sequential retelling of such facts. *See, e.g.*, *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1075 (2d Cir. 1992) (holding that copyright law does not protect the chronological narration of historical events because such ordering is "devoid of creativity"); *Robinson*, 877 F. Supp. at 836 ("[B]ecause the retelling of history necessarily proceeds in a certain chronological order, an author cannot hold a copyright in the sequence of the story's elements."). Any similarity between these two passages concerns only the non-copyrightable elements of plaintiff's passage, and therefore such similarities may not form the basis for a finding of substantial similarity.

Plaintiff advances numerous other arguments concerning alleged similarities between particular aspects of the respective works. I have considered all these arguments, and find them to be without merit—either because the alleged similarities involve non-copyrightable elements of plaintiff's manuscript, or because no reasonable jury could find the manner of expression to be substantially similar.

I can see why plaintiff would be frustrated about the publication of a book that covers similar subject matter as his unpublished manuscript. But no reasonable jury could find that plaintiff's manuscript and defendants' book are substantially similar for copyright purposes in view of the narrow protection afforded to non-fiction accounts. In the absence of any genuine

13

issue of material fact, I will grant defendants' motion for summary judgment as to plaintiff's copyright infringement claim.

Plaintiff's CUTPA claim also fails. CUTPA prohibits the use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Here, it is difficult to discern which of defendants' acts or practices are alleged to be unfair or deceptive, because plaintiff's complaint does not contain any factual allegations that are specific to the CUTPA claim. To the extent that the CUTPA claim is based on defendants' alleged copying of plaintiff's manuscript, that claim is preempted by the Copyright Act. *See Kregos*, 3 F.3d at 666 (holding that "unfair-competition and misappropriation claims, based solely on the copying of the protected expression . . . are preempted by [17 U.S.C.] § 301").

In his memorandum in opposition to defendants' summary judgment motion, plaintiff contends that his CUTPA claim is "based on the authorized use of [his] manuscript by Defendants." Doc. #53 at 22. This argument is without merit, because consulting a manuscript that one has been given when writing a non-fiction book is not actually deceptive, nor does it offend public policy. *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, __ F. Supp. 3d __, 2015 WL 1476400, at *2 (D. Conn. 2015) (noting that CUTPA claims can be based on either actually deceptive practices or violations of public policy, and detailing requirements for both types of claims). Because there is no factual or legal basis for a viable CUTPA claim, I will grant defendants' motion for summary judgment on this claim.

CONCLUSION

The story of David Bushnell and his Revolutionary War-era submarine is a captivating episode in American history. It is little wonder that plaintiff, defendants, and other authors have

14

written about the topic. Copyright law permits authors who do write about Bushnell and the Turtle to write about common facts so long as they do not appropriate the particular expression used by another author. Defendants' book uses many of the same facts and some of the same ideas and concepts as discussed in plaintiff's manuscript, but the book does not appropriate plaintiff's expression. No reasonable jury could find otherwise.

For this reason, defendants' motion for summary judgment (Doc. #41) is GRANTED. The Clerk is directed to close this case.

It is so ordered.

Dated at New Haven this 15th day of July 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge